UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Daniel Lamy,
      Claimant

   v.                                    Case No. 17-cv-609-SM
                                         Opinion No. 2018 DNH 131

Nancy A. Berryhill, Acting Commissioner,
Social Security Administration,
      Defendant


**O R D E R**

Pursuant to 42 U.S.C. § 405(g), claimant, Daniel Lamy, moves to reverse or vacate the Acting Commissioner's decision denying his application for Disability Insurance Benefits under Title II of the Social Security Act. See 42 U.S.C. § 423. The Acting Commissioner objects and moves for an order affirming her decision. For the reasons discussed below, claimant's motion is granted, and the Acting Commissioner's motion is denied.


**Factual Background**

I.   Procedural History.

In January of 2015, claimant applied for Disability Insurance Benefits ("DIB"), alleging that he was disabled and had been unable to work since September 18, 2013. Claimant was 49 years old at the time and had acquired sufficient quarters of

coverage to remain insured through September of 2017.
Claimant's application was denied and he requested a hearing
before an Administrative Law Judge ("ALJ").

In August of 2016, claimant, his attorney, and an impartial
vocational expert appeared before an ALJ, who considered
claimant's application de novo.  About three months later, the
ALJ issued her written decision, concluding that claimant was
not disabled, as that term is defined in the Act, at any time
prior to the date of her decision.  Claimant then requested
review by the Appeals Council.  That request was denied.
Accordingly, the ALJ's denial of claimant's application for
benefits became the final decision of the Acting Commissioner,
subject to judicial review.  Subsequently, claimant filed a
timely action in this court, asserting that the ALJ's decision
is not supported by substantial evidence.

Claimant then filed a "Motion for Order Reversing the
Decision of the Commissioner" (document no. 7).  In response,
the Acting Commissioner filed a "Motion for an Order to Affirm
the Commissioner's Decision" (document no. 9).  Those motions
are pending.

II.  Stipulated Facts.

Pursuant to this court's Local Rule 9.1, the parties have submitted a joint statement of stipulated facts which, because it is part of the court's record (document no. 10), need not be recounted in this opinion. By way of brief background, the court notes the following. Claimant worked as a torch brazer for approximately 25 years at a General Electric facility in Hooksett, New Hampshire. He testified that he began working there at age 21, was making "good money," felt his co-workers "were like family," and, but for his disabling back pain, had planned to retire from there. Admin. Rec. at 56 ("I was there 25 years making good money. But I had to leave the job after only 25 years [while] I was still young. I was only 47. But I could have went another 20 years, you know, and making good money, too. . . . So it was a good job and I was there 25 years and I had to walk away from it.").

Claimant has a long history of back pain, dating to a motorcycle accident in the mid-1980's. Admin. Rec. at 384. As that pain became worse, General Electric tried to accommodate him by providing a stool at his work station, so he could take some pressure off of his legs. Id. at 56. And, under the FMLA, claimant was also permitted to take various periods of time off from work when his pain became too great for him to function

effectively.  Id. at 57.  Eventually, his pain became so severe that he was unable to return to work, General Electric concluded that he was totally disabled, and he began collecting benefits under GE's long term disability plan.

Over the years, claimant's pain has become progressively more severe and disabling.  He has tried various ways to address that pain, including spinal injections and physical therapy, Admin. Rec. at 31, 54-55, 524; wearing a back brace, id. at 58; using a jetted tub, id.; using a cane or walking stick when his "legs are real weak and [his] back is real bad," id. at 50, 458; and, as noted by Dr. Ahn, "taking chronic pain medication for a long time," id. at 524.  Unfortunately, however, his long-term use of those medications (which included 30mg of morphine twice daily) caused stomach and liver problems and he had to discontinue their use.  See Id. 58-59, 327, 419, 444, 524.

In 2013, claimant moved his bed from the second floor to the first, so he could avoid using the stairs.  Admin. Rec. at 247, 253, 277.  At the hearing, claimant described an event that happened about a month earlier when he was awakened in the middle of the night screaming in pain, to the point that he frightened his girlfriend and her dogs (and prompted her to insist that he go to the emergency room for treatment –

something he says he had never done before in his life).  Id. at 66, 453-59.  In July of 2016, following his trip to the emergency room, claimant obtained a surgical consult with Dr. Uri Ahn, at the New Hampshire NeuroSpine Institute.  Dr. Ahn diagnosed claimant with "significant degeneration lateral osteophytes loss of disc space height at L3-4. . . . Degenerative disc disease L3-4 [and] spinal stenosis of lumbar region."  Admin. Rec. at 525-26.  Although Dr. Ahn discussed surgery to address claimant's chronic pain, he discouraged claimant from pursuing that option because the success rate associated with such a procedure is only 66 percent, because infection and nerve damage were a possibility, because claimant was not suffering from constant severe pain, and because he was concerned about claimant's cigarette smoking.  Id.  Dr. Ahn explained that the type of surgery they were talking about was typically recommended only "for people for suffering on a daily basis."  Because claimant's debilitating pain was episodic, surgery was not recommended, "no matter how severe" his pain.  Id. at 525-26.

Nothing in the record suggests that claimant exaggerates his symptoms or is anything but an accurate historian when describing his treatment regimen, medications and their efficacy and side effects, daily activities, and levels of pain.  He has,

5

for example, been consistently forthright with his treating physicians about his efforts to obtain some relief through the use of "alternative" pain medications - something that obviously causes him more than a little embarrassment. See, e.g., Admin. Rec. at 59-60. See also Id. at 303, 454-55, 525. Finally, the evidence is undisputed that he is not a malingerer - indeed, when asked about that topic, one of his treating physicians, Dr. Thomas Synan (who has known claimant for more than twenty years), responded that claimant is "absolutely not" a malingerer. Id. at 452. See also Id. at 390 and 528.

**Standard of Review**

I. "Substantial Evidence" and Deferential Review.

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Factual findings and credibility determinations made by the Commissioner are conclusive if supported by substantial evidence. See 42 U.S.C. §§ 405(g), 1383(c)(3). See also Irlanda Ortiz v. Secretary of Health & Human Services, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated

Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Importantly, it is something less than a preponderance of the evidence, so the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. Consolo v. Federal Maritime Comm'n., 383 U.S. 607, 620 (1966). See also Richardson v. Perales, 402 U.S. 389, 401 (1971).

II. The Parties' Respective Burdens.

An individual seeking DIB benefits is disabled under the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act places a heavy initial burden on the claimant to establish the existence of a disabling impairment. See Bowen v. Yuckert, 482 U.S. 137, 146-47 (1987); Santiago v. Secretary of Health & Human Services, 944 F.2d 1, 5 (1st Cir. 1991). To satisfy that burden, the claimant must prove, by a preponderance of the evidence, that his impairment prevents him from performing his former type of work. See Manso-Pizarro v. Secretary of Health & Human Services, 76 F.3d 15, 17 (1st Cir. 1996); Gray v. Heckler, 760 F.2d 369, 371 (1st Cir. 1985).

7

Here, there is no question that claimant has satisfied his burden. Accordingly, the burden shifts to the Commissioner to show that there are other jobs in the national economy that he can perform, in light of his age, education, and prior work experience. See Vazquez v. Secretary of Health & Human Services, 683 F.2d 1, 2 (1st Cir. 1982). See also 20 C.F.R. §§ 404.1512 and 404.1560.

In assessing a disability claim, the Commissioner considers both objective and subjective factors, including: (1) objective medical facts; (2) the claimant's subjective claims of pain and disability, as supported by the testimony of the claimant or other witnesses; and (3) the claimant's educational background, age, and work experience. See, e.g., Avery v. Secretary of Health & Human Services, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Secretary of Health & Human Services, 690 F.2d 5, 6 (1st Cir. 1982). Ultimately, a claimant is disabled only if his:

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or

> whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

With those principles in mind, the court reviews claimant's motion to reverse and the Acting Commissioner's motion to affirm her decision.

## Background - The ALJ's Findings

In concluding that claimant was not disabled within the meaning of the Act, the ALJ properly employed the mandatory five-step sequential evaluation process described in 20 C.F.R. § 404.1520. See generally Barnhart v. Thomas, 540 U.S. 20, 24 (2003). Accordingly, she first determined that claimant had not been engaged in substantial gainful employment since his alleged onset of disability: September 18, 2013. Admin. Rec. at 28. Next, she concluded that claimant suffers from the following severe impairments: "degenerative disc disease of the lumbar and thoracic spine, degenerative joint disease/osteoarthritis of the knee." Id. at 29. But, the ALJ determined that claimant's impairments, whether considered alone or in combination, did not meet or medically equal one of the impairments listed in Part 404, Subpart P, Appendix 1. Admin. Rec. at 29.

Next, the ALJ concluded that claimant retained the residual functional capacity ("RFC") to perform the exertional demands of "light" work, subject to the following limitations: "he can stand and walk for 4 hours of an 8-hour day, and requires the opportunity to change position from sitting to standing or walking and from standing or walking to sitting, at least once per hour for 3 to 5 minutes at a time. Further, he can never climb ladders and or scaffolds, can occasionally twist at the waist, stoop and crouch and may need to use a cane to ambulate." Id. at 30. In light of those restrictions, the ALJ concluded that claimant was not capable of performing his past relevant work as a torch brazer. Id. at 33. See also Id. at 76 (vocational expert's testimony about claimant's prior work ).

At the final step of the analysis, the ALJ considered whether there were any jobs in the national economy that claimant might perform. Relying upon the testimony of the vocational expert, the ALJ concluded that, notwithstanding claimant's exertional and non-exertional limitations, "there are jobs that exist in significant numbers in the national economy that the claimant can perform." Id. at 33. Consequently, the ALJ concluded that claimant was not "disabled," as that term is defined in the Act, through the date of her decision.

10

**Discussion**

Claimant challenges the ALJ's decision on three grounds, asserting that she erred by: (1) erroneously giving greater weight to the opinion of a non-examining state agency physician than to the opinions of claimant's treating physicians; (2) improperly evaluating claimant's testimony in light of the recently-adopted Social Security Ruling concerning claimants' credibility; and (3) failing to resolve a potential conflict between the vocational expert's testimony and the Dictionary of Occupational Titles (concerning claimant's possible need to rely upon a cane to ambulate). Because the court agrees that the ALJ failed to give sufficient reasons for affording only limited weight to the opinions of claimant's treating sources, it need only address that issue.

In discussing the weight that will be ascribed to the opinions of "treating sources," the pertinent regulations provide:

> Generally, we give more weight to opinions from [the claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) . . . When we do not give the treating source's opinion controlling weight, we apply the factors listed [in this section] in determining the weight to give the opinion. We will always give good reasons in our notice of

determination or decision for the weight we give [the claimant's] treating source's opinion.

20 C.F.R. § 404.1527(c)(2). <u>See also</u> Social Security Ruling, <u>Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions</u>, SSR 96-2p, 1996 WL 374188 (July 2, 1996) (when the ALJ renders an adverse disability decision, his or her notice of decision "must contain specific reasons for the weight given to the treating source=s medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source=s medical opinion and the reasons for the weight."). Importantly, however, there is no per se rule requiring the ALJ to give greater weight to the opinion of a treating source. To be entitled to controlling weight, a treating source's opinions must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [cannot be] inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. ' 404.1527(c)(2).[1]

---

[1] The court notes that the rules addressing the weight to be afforded to treating sources were changed effective March 27, 2017. <u>See</u> 20 C.F.R. § 404.1520c. But, because the claim at issue was filed prior to that date, those new regulations do not apply to this case.

12

Here, the record contains three treating source statements: one from Dr. Powen Hsu (a long-time treating source), Admin. Rec. at 389-93; one from claimant's newest primary care physician, Dr. Alan Stein, id. at 527-31; and one from another long-time primary care physician, Dr. Thomas Synan, who has known claimant for more than twenty years, id. at 448-52. They are remarkable in their consistency. At least two treating sources agree (while one did not opine) on the following facts: claimant can walk only a single city block before needing to rest due to severe pain; during an 8-hour workday, claimant would need to walk around at least every hour for about five minutes; and, because claimant's severe pain waxes and wanes, his impairments are likely to produce "good days and bad days."

All three treating physicians unite in opining that: claimant suffers from chronic severe back pain; he is not a malingerer; emotional factors do not contribute to claimant's pain; his impairments are consistent with his symptoms and physical limitations; claimant is able to sit for between 15 minutes (two opinions) and hour (one opinion) before needing to get up; he can stand for somewhere between 5 minutes to less than one hour before needing to sit down; claimant would need unscheduled periods of walking around during an 8-hour workday; he would require a job that permits him to alternate at will

13

between sitting, standing, or walking; and, finally, claimant would be absent from work "more than four days per month" due to his impairment - the very issue that prompted his prior employer to grant him periodic FMLA leave, before ultimately concluding that he is totally disabled.

The explanations the ALJ offered for discounting the opinions of claimant's three treating source are, on balance, insufficient. For example, she noted that Dr. Uri Ahn observed "no evidence of significant foraminal or central canal stenosis." Admin. Rec. at 31. What the ALJ did not mention was Dr. Ahn's conclusion that claimant does suffer from "spinal stenosis of the lumbar region," with "disc degeneration" and "significant degeneration lateral osteophytes loss of disc space height at L3-4." Id. at 525-26. See also Id. at 338 (January, 2015, assessment of Dr. Hsu: "Lumbar disc degeneration. Herniated thoracic disc."). The ALJ also noted that Dr. Ahn reported that claimant had been off prescribed pain medications for the past eight months. But, as claimant testified at the hearing (and as his various treating sources have acknowledged), he was forced to stop taking opiates because they were causing stomach problems and liver damage. Id. at 58-59. He did, however, continue to take "800s to try to take the edge off."

Id. at 58 (referring to his use of prescription strength Ibuprofen).

The ALJ describes claimant's decision to stop taking prescription pain medications as a "choice" that implies his pain is not as significant as he claims. Admin. Rec. at 31. But, given the significant side effects those medications were causing, that is not a reasonable inference to draw.

The ALJ also concluded that claimant's reported activities of daily living were inconsistent with an inability to perform light work. Id. at 31. She seems to have focused on claimant's ability to assist his girlfriend in doing modest household chores during his "good" days and his continued ability to hunt deer. But, as claimant explained in his testimony, his hunting excursions have changed dramatically as a result of his back pain. While he once hunted deer in the woods from tree stands, he was now restricted to using a blind that he constructed on the ground in his backyard.

> I used to be able to walk a lot, hunt the power line, go down four or five telephone poles down. Walk in the woods. Sit, drag out a deer, whatever, back in the day.
>
> And now it's gotten to the point I hunt in my own backyard and 100, 150 yards behind my own house and I have to stop halfway out to my blind to take a break

15

> with my legs from walking. And the thing is I grew up
> since I was six years old hunting and fishing. My mom
> hunts, my dad. We're a hunting family and all that.
> They still hunt in their 70's and they live down the
> road from us like I said and my fiancée outside hunts.
> I just can't do what I used to do. That's the bottom
> line and if they cut my legs off at the knees, I would
> try to drag myself out there to hunt because number
> one, I love it. I've always done it. That's -- means
> a lot to me. And number two, I got high cholesterol
> and Dr. Stein had told me before eat all the venison
> you can because it's so lean, it's good for you. So
> if we get a deer, that's our meat for the winter. So
> the thing is I can't do what I used to do, but like I
> said, if they cut my legs off, I'd still try to drag
> myself out there to hunt.

Id. at 61. See also Id. at 63 ("Yeah, because back in the day, I used to use tree stands. I'd climb up in a tree stand. Now I have a ground blind. I got a little zipper door. You walk in and [there's] a little chair. You sit down and [there's] a little open window . . .."). Because of his disability, claimant was unable to continue hunting with a bow and arrow. Instead, he obtained a special permit from the State of New Hampshire (apparently available only to those with disabilities) that allowed him to use a crossbow, so he would not strain his back tensioning the bow string (he uses a special tool that he can crank to tension the bowstring). Id. at 62.[2]

---

[2] Dr. William Backlund, a non-examining state agency physician, who opined that claimant was capable of light work (an opinion to which the ALJ gave "great weight") also seemed to rely heavily on claimant's ability to hunt in reaching the conclusion that the record evidence does not support the assertion that claimant is "significantly limited in

The ALJ also discounted the opinions of Dr. Hsu because, among other things, it was unclear to her "who prepared the forms, as the handwriting appears distinct between them." Id. at 32. That, plainly, is not a reason to discount those opinions. Dr. Hsu signed the form (thereby fully adopting its content). Even if another staff person assisted him in preparing portions of it, his endorsement makes the conclusions his own. The ALJ similarly discounted the opinions of Dr. Synan (the physician who has known claimant for more than 20 years) because his opinion that claimant would be absent for more than four days each month was "unexplained" and contrary to "clinical findings discussed in this decision." Id. at 32. But, it probably bears noting that the form completed by Dr. Synan (and Dr. Stein and Dr. Hsu) does not ask for an explanation; it simply asks for an opinion: "Please estimate, on average, how many days per month your patient is likely to be absent from work as a result of the impairments or treatment." Id. at 452. See also Id. at 393, 531.

---

ambulation." See Admin. Rec. at 94. In addition to being cursory to the point of lacking any meaningful discussion of the medical record (a point for which the ALJ faults various treating source opinions), Dr. Backlund's opinion seems to ignore claimant's need to switch to a backyard blind and to a crossbow. It is also, without adequate explanation, entirely inconsistent with the opinions of claimant's three treating sources.

17

The point does not require repetition.  While review of an ALJ's disability decision is highly deferential, and while that decision need only be supported by "substantial evidence," the court is constrained to conclude that the ALJ's decision to substantially discount the opinions of claimant's three treating sources is inadequately explained, and not adequately supported by her stated reasons.

## Conclusion

There is, to be sure, some evidence in the record - primarily opinions from non-treating sources that are not terribly well-supported - to support the ALJ's decision.  And, while the court recognizes that the governing standard of review is quite deferential, it is not without meaning altogether.  The court is compelled to conclude that the evidence and the opinions upon which the ALJ relied, and her reasons for doing so, are insufficient to constitute "substantial evidence" - particularly when balanced against the significant evidence (which includes claimant's long work history at General Electric and three reliable treating source opinions) strongly suggestive of claimant's disability.

For the foregoing reasons, as well as those set forth in claimant's memorandum, claimant's motion to reverse the decision

of the Commissioner (document no. 7) is granted to the extent he seeks an order vacating the ALJ's decision and a remand for further proceedings consistent with this order. The Acting Commissioner's motion to affirm her decision (document no. 9) is denied.

Pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the ALJ dated November 2, 2016, is vacated and this matter is hereby remanded for further proceedings consistent with this order. The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

June 22, 2018

cc: D. Lance Tillinghast, Esq.
    Terry L. Ollila, AUSA

19